# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARDTRONICS USA, INC.,<br>864 Spring St NW<br>Atlanta, GA, 30308-1007<br><br>*Plaintiff*,<br><br>v.<br><br>VISA INC., VISA U.S.A. INC., VISA<br>INTERNATIONAL SERVICE<br>ASSOCIATION, and PLUS SYSTEM, INC.,<br>One Market Plaza<br>San Francisco, CA 94105<br><br>and<br><br>MASTERCARD INCORPORATED,<br>MASTERCARD INTERNATIONAL<br>INCORPORATED d/b/a Mastercard<br>Worldwide,<br>2000 Purchase Street<br>Purchase, NY 10577<br><br>*Defendants*. | Civil Action No.: _____<br><br>**COMPLAINT<br>AND JURY DEMAND** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................... 1

        A.      Nature of Action and Summary ......................................................... 4

        B.      Cardtronics' Membership in the Defined/Certified Class and Scope of
                Cardtronics' Opt-out Claims ............................................................. 14

II.     JURISDICTION AND VENUE ............................................................................ 20

III.    THE PARTIES AND NONPARTY CO-CONSPIRATORS ........................................... 21

        A.      Plaintiff ............................................................................................. 21

        B.      Defendants ........................................................................................ 22

        C.      Non-Party Co-Conspirators ............................................................. 23

IV.     FACTUAL BACKGROUND .................................................................................. 24

        A.      Brief History and Overview of "Independent" ATMs ...................... 24

        B.      The Mechanics of an ATM Transaction ........................................... 25

        C.      The Fee Structure of a Foreign ATM Transaction ........................... 27

        D.      The ATM Restraints: Visa's and Mastercard's "Non-Discrimination Rules" ...... 30

        E.      The Horizontal Nature of the Separate but Related Visa and Mastercard
                Cartels .............................................................................................. 34

V.      TRADE AND INTERSTATE COMMERCE .............................................................. 36

VI.     RELEVANT MARKET ........................................................................................ 37

VII.    MARKET POWER .............................................................................................. 39

VIII.   ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY ..................................... 42

IX.     INJURY IN FACT TO CARDTRONICS .................................................................. 47

X.      NO COUNTERVAILING FACTORS ...................................................................... 51

XI.     TOLLING OF STATUTE OF LIMITATIONS ........................................................... 52

XII.    VIOLATIONS ALLEGED AND CLAIMS FOR RELIEF ............................................ 54

Claim 1: Sherman Act, Section 1, 15 U.S.C. § 1 (Against Visa and Mastercard for Unlawful Agreement Among and Between Competing Banks) ..................................................... 54

Claim 2: Sherman Act, Section 1, 15 U.S.C. § 1 (Against Visa for Unreasonable Vertical Agreements Between Visa and Its Member Banks) ....................................................... 55

Claim 3: Sherman Act, Section 1, 15 U.S.C. § 1 (Against Mastercard for Unreasonable Vertical Agreements Between MasterCard and Its Member Banks)............................................. 56

REQUEST FOR RELIEF ............................................................................................................ 57

JURY DEMAND ........................................................................................................................... 58

Plaintiff Cardtronics USA, Inc. ("Cardtronics"), by and through its undersigned counsel, alleges for its Complaint against Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, Plus System, Inc. (collectively, "Visa" or "Visa Defendants"), Mastercard Incorporated, and Mastercard International Incorporated (collectively, "Mastercard" or "Mastercard Defendants," and together with the Visa Defendants, "the Defendants"), upon knowledge as to itself and to its own actions, and upon information and belief as to all other matters alleged below, as follows:

## I. <u>INTRODUCTION</u>

Before Visa and Mastercard became public companies in 2008 and 2006, competing banks, as owners and members of Visa and MasterCard and their associated Visa or Mastercard ATM networks, promulgated and agreed to anti-competitive rules in response to rising competition from nonbank (independent) ATMs. The agreed-upon rules prevent both bank and independent ATM operators from charging ATM cardholders less for ATM access through lower-cost ATM networks than Visa and Mastercard (the "Access Fee Rules" or "Rules"). While it is unusual for a supplier of a product or service (*e.g.*, Visa or Mastercard) to restrict what resellers (*e.g.*, ATM operators like Cardtronics) can charge the reseller's customers (*e.g.*, ATM cardholders) for the product or service of a competing supplier (*e.g.*, ATM networks that compete with Visa or Mastercard for the business of independent ATM operators), there was method to the madness. The Access Fee Rules assured Visa, Mastercard, and their owner/member banks that their networks would not lose ATM transaction volume to price competition. These horizontal conspiracies among competing banks— one with Visa as ringleader and enforcer, the other with Mastercard—achieved their anticompetitive purpose and continue to this day**.**

1

ATM networks like Mastercard and Visa charge independent ATM operators a per-transaction "Acquirer Fee" to route ATM transactions over their networks. In 2010, Mastercard raised that fee by 300%. Visa followed suit in 2012. Acquirer Fees are a major component of an independent ATM operator's costs. Cardtronics alone, as the nation's largest independent ATM operator, has paid over a half billion dollars in Acquirer Fees since 2007. Yet, Visa and Mastercard lost no business from Cardtronics or independent ATM operators following their astounding price increases. In fact, the volume of transactions routed over Defendants' networks has only grown.

Why?

First, the overwhelming majority of debit cards issued by banks and used for ATM transactions in the United States are Visa- or Mastercard-branded debit cards. As a result of this market power, an independent ATM operator cannot exist without access to Defendants' networks. Second, Defendants will not allow an independent ATM operator to use their networks unless the operator agrees to abide by the Access Fee Rules. This restriction is critically important both to the independent ATM operator who needs access to the Mastercard and Visa networks to stay in business, and to the cardholder who wants to conduct an ATM transaction some place other than a bank. Just as ATM networks charge independent ATM operators a fee to use their networks, operators charge cardholders an "Access Fee"—commonly referred to as a "surcharge"—for the convenience of using the nonbank ATM. But for the Access Fee Rules, the independent ATM operator could levy surcharges on cardholders that bear a relationship to the actual cost of the network over which the transaction is routed. For example, the independent ATM operator could charge cardholders lower Access Fees for transactions routed over an ATM network like NYCE, which costs the ATM operator $0.06 per transaction, as compared to the Access Fee it charges cardholders for transactions routed over the Visa network, which costs the ATM operator $0.16,

or the Mastercard network, which now costs the operator $0.28. This "differential surcharging" is prohibited by the Access Fee Rules. Without it, (a) independent ATM operators are unable to set "differentiated" surcharges at levels that reflect their actual costs and, through pricing, steer cardholders to lower-cost networks; (b) cardholders pay higher surcharges and are unable to even voice a preference for reduced-surcharge debit cards that are linked to lower-cost networks; and (c) Visa and Mastercard lose no market share to competing networks, even though Defendants charge their customers (independent ATM operators) more than three times the fees charged by their competitors.

Visa and Mastercard are not the only beneficiaries of these anticompetitive restraints. Because this is a *horizontal* conspiracy, significant benefits flow back to where it all began: the competing banks who agreed to implement the Access Fee Rules in response to the rise of independent ATM operators. For example, according to court filings, Mastercard used the inflated Acquirer Fees—the very overcharges that Cardtronics claims in this lawsuit—to fund "incentive payments" to banks (as issuers of Mastercard-branded debit cards).[1] In exchange for these payments, banks designate Mastercard as the "priority" ATM network over which the independent ATM operator *must* route transactions or face significant fines from Mastercard. Mastercard defends the Access Fee Rules and these payments as "procompetitive" because they increase Mastercard volume and help strengthen the Mastercard brand. Far from it. Mastercard's funneling of a "cut" of the ill-gotten gains to issuers/banks (*i.e.*, nonparty co-conspirators) by disguising

---

[1] *See* Visa and Mastercard Defendants' Memorandum of Law in Opposition to Plaintiffs' Motions for Class Certification and Appointment of Class Representatives and Class Counsel at 20–21, *Nat'l ATM Council, Inc. et al. v. Visa Inc. et al.*, No. 1:11-cv-01803-RJL (D.D.C. June 29, 2020), Dkt. No. 182 ("Mastercard intended to use the money it collected from charging a fee to ATM acquirers to provide incentives to issuing banks….") [hereinafter "Defendants' Class Certification Opp."].

them as "incentive payments" only confirms the existence of a per se unlawful horizontal arrangement to the collective benefit of Defendants and the nonparty co-conspirator member banks.

By serving the conspiratorial goals of their member banks, the Defendants have injured competition and independent ATM operators, like Cardtronics, who (i) cannot exist if they do not accept Visa and Mastercard transactions, (ii) cannot accept Visa and Mastercard transactions if they do not comply with the Access Fee Rules, and (iii) cannot respond to supracompetitive network fees via differential surcharging if they comply with those Rules. This Complaint is filed to redress those wrongs.

A.    **Nature of Action and Summary**

1.    Cardtronics is the nation's largest independent (*i.e.*, nonbank) owner, operator and deployer of ATM terminals and, through its division, Columbus Data Services (sometimes separately referred to as "CDS"), is also one of the nation's largest independent ATM processors. As a direct purchaser of electronic-fund-transfer ("EFT") services from ATM networks, Cardtronics brings this action under the federal antitrust laws seeking treble damages from Mastercard and Visa for overcharges that Cardtronics paid to ATM networks since October 1, 2007. Cardtronics also seeks injunctive relief to end the anticompetitive restraints that caused Cardtronics to pay these overcharges. Cardtronics is a member of a certified class of independent "ATM Operators"—defined *infra* ¶ 17—in a class action against the Visa and Mastercard Defendants that is currently pending in this district (the "ATM Operator Class Action").[2]

---

[2] *See Nat'l ATM Council, Inc. v. Visa Inc.*, No. 11-cv-1803, 2021 WL 4099451, at *5–7 (D.D.C. Aug. 4, 2021), *aff'd*, 2023 WL 4743013 (D.C. Cir. July 25, 2023), *reh'g denied en banc*, 2023 WL 6319404 (Sept. 13, 2023); *see also* Amended Order Granting Plaintiffs' Motion for Class Certification and Appointing Class Counsel, *Nat'l ATM Council, Inc.*, No. 1:11-cv-1803-RJL (D.D.C. Sept. 7, 2021), Dkt. No. 197 [hereinafter "Amended Certification Order"].

2.      By filing this action, Cardtronics exercises its right under Federal Rule of Civil Procedure 23 to be excluded from the class. *See* Fed. R. Civ. P. 23(c)(2)(B)(v) (requiring notice to the class members "that the court will exclude from the class any member who requests exclusion").

3.      To apprehend the claimed antitrust violations, one must understand the standardized structure of a "foreign" ATM transaction—the only kind at issue here—and the various fees involved. In the ATM business, a "foreign transaction" does not denote anything international, but rather a cardholder's use of an ATM not operated by the financial institution that issued the card. A foreign ATM transaction cannot originate and proceed unless the card-issuing bank and the ATM terminal share an ATM network. In exchange for enabling the transaction, the ATM network charges the independent (*i.e.*, nonbank) ATM operator a per-transaction usage fee, referred to as an "Acquirer Fee" (*see* definition *infra* ¶ 48). The ATM network also establishes a fee that is paid by the card-issuer, referred to as the "interchange fee" or "Interchange" (*see* definition *infra* ¶ 48). The ATM operator pays the Acquirer Fee to the network out of the Interchange it receives from the card-issuing bank. Thus, a principal source of revenue for an independent ATM operator in a foreign ATM transaction is the per-transaction amount of Interchange revenue left to the ATM operator after it pays the Acquirer Fee, referred to as the "Net Interchange." Higher Acquirer Fees (paid to the network) or diminished Interchange (set by the network) depress the independent ATM operator's Net Interchange. The ATM operator's other principal source of revenue under this framework is a per-transaction fee it charges the cardholder, referred to in the industry as an "Access Fee" or, in more common parlance, a "surcharge" (*see* definition *infra* ¶ 48).

4.      As an independent ATM owner and operator that (i) receives Interchange from issuers, (ii) pays Acquirer Fees directly to ATM networks, (iii) provides access to ATM networks, and (iv) otherwise originates ATM transactions, Cardtronics is an "ATM Operator" as defined in the ATM Operator Class Action (which definition is adopted herein and set forth in *infra* ¶ 17). However, as alleged more fully below, not all ATM Operators receive Interchange from issuers and pay Acquirer Fees directly to ATM networks. Thus, for purposes of this Complaint and Cardtronics' opt-out claim, the relevant actors in a foreign ATM transaction include: (1) the *cardholder* who inserts his or her bank-issued ATM card into an ATM terminal of his or her choosing; (2) the bank that issued the accountholder's ATM card and maintains the cardholder's accounts—the *issuer*; (3) the ATM Operator that earns Net Interchange by receiving Interchange from the issuer and paying the Acquirer Fee to the ATM network (*e.g.*, Cardtronics); and (4) the ATM network that connects the "foreign" ATM to the banks. For clarity, Cardtronics' claims herein are based on ATM transactions in which Cardtronics (i) acted as an "ATM Operator," as that term is defined in the ATM Operator Class Action, ***and*** (ii) earned Net Interchange by receiving Interchange and paying an Acquirer Fee.

5.      Visa and Mastercard exercise substantial market power as the leading brands of debit payment cards and the dominant networks for banking transactions at ATMs in the United States. At the heart of the Defendants' alleged antitrust violations are contractual restraints agreed to by competing banks, and maintained and enforced by Visa and Mastercard, which disallow independent ATM operators (as  well as "acquirer" banks accepting ATM cards issued by other banks in a foreign transaction) from offering discounts for cash withdrawals processed over their competitors' networks to reflect the lower net cost of processing the transaction. This restraint is significant because, as shown below, Visa and Mastercard consistently compensate independent

ATM operators at much lower levels than any of their network competitors. Specifically, Cardtronics challenges the Access Fee Rules (referred to as "non-discrimination rules" by Defendants) and the enforcement of those Rules, which constrain the ability of independent ATM operators to steer ATM consumers and transactions to more efficient ATM networks that charge independent ATM operators less than Mastercard and Visa for ATM network services by imposing lower Acquirer Fees, setting higher Interchange, or both (the "ATM Restraints"). The ATM Restraints (i) reduce interbrand competition among ATM networks; (ii) suppress economic output in the form of fewer ATM transactions and fewer ATMs deployed; (iii) force Cardtronics (and other independent ATM operators) to pay supracompetitive overcharges to all ATM networks for ATM transactions by decreasing the independent ATM operator's Net Interchange; (iv) force independent ATM operators to charge and force consumers to pay inflated and unreasonable ATM Access Fees for each ATM transaction; and (v) otherwise restrain competition in connection with ATM transactions at nonbank ATMs in the United States.

6.     The time period relevant to this action (referred to interchangeably as the "Relevant Period" or the "Class Period") is from October 1, 2007, to the present. During that time, Cardtronics deployed tens of thousands of ATMs in the United States.

7.     Defendants own or operate ATM networks (*i.e.*, the "Mastercard ATM Networks" and "Visa ATM Networks," defined *infra* ¶ 17) that enable banks to communicate with ATMs owned and/or deployed by banks or independent ATM operators, including Cardtronics. Visa's principal ATM network is Plus and Mastercard's is Cirrus. ATM networks unaffiliated with Defendants include Pulse (Discover), NYCE, Star, Armed Forces Financial Network, Exchange, Credit Union 24, and others (referred to in the industry as "regional networks"). Throughout the Relevant Period, Defendants' ATM networks possessed and wielded substantial market power in

the relevant market (defined *infra* ¶¶ 71-75 as ATM network services in the United States or, alternatively, the platform on which foreign ATM transactions occur in the United States). Tens of millions of debit/ATM cards are issued on Defendants' networks. Since 2007, at ATMs deployed by Cardtronics alone, in excess of 3.5 billion cash withdrawal transactions—more than 70% of all withdrawals at Cardtronics ATMs in the United States—have been routed over the Mastercard and Visa ATM networks. On an industry-wide basis, more than half of all ATM transactions are now routed over Defendants' networks. Despite the existence of "regional networks," Cardtronics and other ATM Operators could not, and cannot, be commercially viable without access to the Mastercard and Visa networks. As "must accept" propositions in the ATM business, Defendants' networks have given Mastercard and Visa the power to impose the ATM Restraints on Cardtronics and other ATM Operators, and those restraints prevent ATM Operators from pricing ATM transactions as they would have in a competitive market. The ATM Restraints also forced Cardtronics and other ATM Operators to pay supracompetitive network fees, not just for transactions routed over Defendants' networks, but also for transactions on other networks, where fees have risen in the absence of competition. Visa and Mastercard's exercise of that substantial market power is ongoing and continues to this day.

8.    The Defendants' operating rules recognize that ATM Operators may lawfully charge cardholders an Access Fee for certain ATM transactions. However, as a contractual condition of using their "must have" networks, Mastercard and Visa require that ATM Operators must agree to and abide by rules governing the Access Fees that cardholders may be charged. These Access Fee Rules prohibit ATM Operators from charging Access Fees for transactions processed over Visa and Mastercard networks that are higher than the lowest Access Fees charged for transactions processed over other networks. The Rules thus prohibit ATM Operators from

charging consumers a discounted Access Fee for transactions carried over different networks, even where the ATM Operator's cost of using those different networks may vary markedly.

9.    In 2011, three nationwide class action lawsuits were filed in the United States District Court for the District of Columbia (collectively the "Class Actions"), alleging that, through the same ATM Restraints challenged herein, Visa and Mastercard suppress competition from other ATM networks; force ATM Operators to pay supracompetitive overcharges to ATM networks; force ATM Operators to charge cardholders (and cause consumers to pay) supracompetitive Access Fees; and otherwise harm competition in the market for ATM network services—all in violation of the federal antitrust laws and state competition laws. The plaintiffs in the ATM Operator Class Action brought suit on behalf of themselves and a putative class of ATM Operators owning or operating an estimated 200,000 nonbank ATM terminals in the United States.[3] The plaintiffs in *Burke v. Visa Inc., et al.*, No. 1:11-cv-01832-RJL, sued on behalf of millions of consumers (cardholders) who paid unreimbursed Access Fees subject to the Access Fee Rules on transactions at ATMs not owned or operated by a bank (the "Independent ATM Consumer Class Action").[4] Both the ATM Operator Class Action and the Independent ATM Consumer Class Action allege that Visa and Mastercard conspired with nonparty banks to execute the scheme. Plaintiffs in a third action, *Bartron, et al., v. Visa Inc., et al.*, No. 1:11-cv-01831-RJL, included only consumers who paid unreimbursed Access Fees subject to the Access Fee Rules on transactions at ATMs owned or operated by a bank other than the bank that issued the consumer's card, and it named certain co-conspirator banks as additional defendants (the "*Mackmin* Class

---

[3] Second Amended Class Action Complaint at ¶ 25, *Nat'l ATM Council, Inc.*, No. 1-11-cv-01803-RJL (D.D.C. Nov. 23, 2015), Dkt. No. 55.
[4] Fourth Amended Class Action Complaint at ¶ 56, *Burke v. Visa Inc. et al.*, No. 1:11-cv-01882-RJL (June 12, 2019), Dkt. No. 102.

Action").[5] The district court granted class certification in all three actions, holding that the three proposed classes met the requirement under Federal Rule of Civil Procedure 23(b)(3) that common questions of law or fact predominate over individual ones. *See Nat'l ATM Council, Inc. v. Visa Inc.*, 2021 WL 4099451, at *5–7 (D.D.C. Aug. 4, 2021). On appeal, the D.C. Circuit affirmed. *See* 2023 WL 4743013 (D.C. Cir., July 25, 2023), *reh'g en banc denied*, 2023 WL 6319404 (Sept. 13, 2023).[6]

10.     The ATM Restraints violate Section 1 of the Sherman Act because they operate as an "anti-steering" mechanism, which is a function of the economic structure under which ATM Operators pay various fees and earn revenue in a foreign ATM transaction. As the D.C. Circuit explained in its affirmance of class certification, and as Cardtronics adopts and incorporates as its allegations herein, the "rudder" in this anti-steering claim is the ATM operator's ability to implement "differential surcharging" with respect to the Access Fees the independent ATM operators charge cardholders on a per-transaction basis:

> Given that Mastercard's and Visa's network fees are comparatively high, all else being equal, independent ATM operators would presumably favor ATM networks offering network service for less. And one might expect that an ATM operator seeking to expand its customer base would seek to attract customers whose transactions could be routed over lower-cost networks. An ATM operator could attract customers by engaging in "differential surcharging," that is, charging higher access fees for transactions routed over higher-cost networks like Visa's and Mastercard's—and sharing savings from use of regional networks with cardholders served via those lower-cost networks. If lower access fees were not barred by the Access Fee Rules, demand from customers seeking lower access fees, including those with cards currently limited to Mastercard's and Visa's networks, would

---

[5] *See* Second Amended Class Action Complaint, *Bartron, et al., v. Visa Inc., et al.*, No. 1:11-cv-01831-RJL (D.D.C. Nov. 23, 2015), Dkt. No. 84.

[6] On June 20, 2025, the court in the *Mackmin* Class Action entered a "Final Judgment of Dismissal with Prejudice as to Network Defendants," following the approval of a settlement agreement pursuant to Federal Rule of Civil Procedure 23. *Bartron, et al.*, No. 1:11-cv-01831-RJL, Dkt. No. 305. The ATM Operator Class Action and the Independent ATM Consumer Class Action remain pending.

presumably drive card-issuing banks to offer them via connections to networks other than Mastercard's and Visa's.

In sum, the ATM customer plaintiffs would benefit if independent ATM operators offered them account access for less. ATM Operator plaintiffs would benefit if they could earn more per transaction through network-fee savings, or if they could attract more customers and increase their volume of transactions by differentially charging lower ATM access fees to process transactions over less expensive ATM networks. But, Plaintiffs argue, the Access Fee Rules challenged here foreclose those benefits [and] obstruct competition....[7]

11.    Cardtronics brings these anti-steering claims individually, as an "opt out" from the ATM Operator Class Action, to seek damages for, and to enjoin, anti-competitive Visa and Mastercard rules that prevent Cardtronics from making transparent to consumers the differential costs of competing ATM networks, or from providing discounts to encourage and incentivize consumer demand and choices. As alleged more fully below, Cardtronics has the economic incentive, business acumen and technological capability to provide such transparency and to implement differential surcharging, which would promote interbrand competition among ATM networks and cause ATM transactions to be routed over more efficient and less expensive ATM networks. The ATM Restraints have thwarted this pro-consumer benefit and insulated Defendants' ATM networks from price competition from competing ATM networks, further solidifying Visa and Mastercard's substantial market power in the relevant market. The suppression of price competition and price transparency to consumers—the twin hallmarks of competitive markets— have harmed competition in the relevant market, resulting in higher prices for cardholders and less output. In addition, this harm to competition has empowered Visa and Mastercard to charge supra-competitive Acquirer Fees and otherwise reduce Net Interchange, causing injury to and inflicting damages on Cardtronics.

---

[7] *Nat'l ATM Council, Inc.*, 2023 WL 4743013 at *2–3.

12.     The history of the Access Fee Rules is relevant to the horizontal nature of the conspiracy challenged here. The Rules were agreed to by the nation's banks when the banks owned and controlled Visa and Mastercard and owned and controlled virtually all ATMs. The Access Fee Rules ensured that the advent of ATM surcharging in the mid-1990s and the entry into the market of new, independent, non-bank ATM operators would not result in ATM Access Fee price competition at the terminal between banks on the basis of the cards the banks issue or the costs or efficiency of the ATM networks the banks chose to associate with those cards. Instead, the member banks agreed to restrain price competition in ATM Access Fees at the terminal between cards bearing different ATM network associations. In this way, Mastercard-issuing banks that may have had to pay more to their network for each ATM transaction would not be exposing their customers to the threat of having to pay a higher Access Fee than customers of a Visa-issuing bank that may have had to pay less to their network for each ATM transaction. The Access Fee Rules thereby insulate banks against the competitive market consequences of choosing to issue cards associated with inefficient, more costly ATM networks and insulate the networks themselves from the competitive market consequences of being inefficient and more costly.

13.     The ATM Restraints are per se unlawful horizontal agreements in restraint of trade. Defendants are corporate descendants of bankcard associations that, formerly, were jointly owned and operated by a majority of the retail banks in the United States. Prior to initial public offerings ("IPOs")—after which Mastercard and Visa stock began trading on the New York Stock Exchange in 2006 and 2008, respectively—the member banks used the bankcard associations to adopt and enforce a supracompetitive pricing regime for Access Fees. That regime was agreed to by the banks themselves. Member banks appointed representatives to the bankcard associations' boards of directors, which in turn established the anticompetitive Access Fee Rules, with the cooperation

and assent of the member banks. Thus, the unreasonable restraints of trade at the heart of Cardtronics' anti-steering claims are horizontal agreements among the issuers of Visa and Mastercard products to adhere to and enforce rules and operating regulations that require Access Fees to be fixed at a certain level.

14.     By permitting the 2006 and 2008 IPOs and relinquishing their ownership of Mastercard and Visa, the owner/member banks effectively delegated to Visa and Mastercard, in perpetuity, the ability to fix the price of, and set the rules relating to, ATM transactions processed over Visa's and Mastercard's ATM networks, including Plus and Cirrus. In other words, the banks collectively have ceded power and authority to Visa and Mastercard to design, implement and enforce a horizontal price-fixing conspiracy in which the banks are knowing participants and beneficiaries, and which is organized and supervised by the Defendants as ringleaders and enforcers. These banks knew that Visa and Mastercard would continue to enforce the Access Fee Rules, which the Defendants continue to do to this day. *See Osborn v. Visa Inc.*, 797 F.3d 1057, 1066–67 (D.C. Cir. 2015) (vacating order of dismissal with prejudice in the ATM Operator Class Action) ("[T]he Plaintiffs have alleged a horizontal agreement to restrain trade…. That the [Access Fee] rules were adopted by Visa and MasterCard as single entities does not preclude a finding of concerted action. … The allegations here—that a group of retail banks fixed an element of access fee pricing through bankcard association rules—describe the sort of concerted action necessary to make out a Section 1 claim.")

15.     Even if not per se unlawful, the ATM Restraints violate the "rule of reason" established by antitrust caselaw. It is sometimes the case that a business-supplier will attempt to restrict what reseller-customers can charge for the supplier's own product or service. But it is highly unusual and anticompetitive for a supplier to restrict what others can charge for the product

13

or service of a competing supplier. That is exactly what the ATM Restraints do. There is no economic or procompetitive justification for the ATM Restraints, and the markets would function more fairly and efficiently without them.

16.    Although the applicable statute of limitations is four years, Cardtronics asserts tolling of the statute of limitations to preserve claims for injuries dating back to October 1, 2007, and continuing through the present day. Based upon the filing and pendency of the certified ATM Operator Class Action, tolling exists under the doctrine established by the United States Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). The "Class Period" certified in the ATM Operator Class Action is "between October 1, 2007 and the present."[8] As more fully alleged below, Cardtronics is a member of the ATM Operator Class Action that has been certified by the court. The same claims asserted in this opt-out action were asserted against these same Defendants in the ATM Operator Class Action. The alleged wrongdoing and injury have continued through the present day and are ongoing. *See Osborn*, 797 F.3d at 1065 ("The economic injury alleged is present and ongoing."), *cert. dismissed*, 580 U.S. 993 (2016).

**B.    Cardtronics' Membership in the Defined/Certified Class and Scope of Cardtronics' Opt-out Claims**

17.    The class certified in the ATM Operator Class Action is defined as follows:

> All **ATM Operators** that originated an **Authorized Surcharged ATM Cash Disbursement** at a **Qualified ATM** at any time between October 1, 2007 and the present (the "Class Period")

Amended Certification Order, *supra* note 2, at 1 (emphasis of defined terms added). The Amended Certification Order further states that the class definition is "subject to the limitations and definitions set forth in the ATM Operator Plaintiffs' Corrected Motion for Class Certification, filed

---

[8] Amended Certification Order, *supra* note 2, at 1.

on September 19, 2019 (Dkt. # 154–1)." *Id.* The definitions (which are adopted herein) include, without limitation:[9]

- **"ATM Operator"** is any person or entity that owned, operated, or leased a Qualified ATM that was authorized by a Mastercard Member or Visa Member, or by the agent of such Member, to originate an ATM Cash Disbursement through the connection of the Qualifying ATM to the Visa or Mastercard ATM Networks. "ATM Operator" includes **ATM Independent Sales Organizations** ("**ISOs**") sponsored by a Mastercard Member or Visa Member and authorized to connect a Qualified ATM to the Mastercard or Visa ATM Networks, together with the affiliates of ATM ISOs authorized by the ATM ISO to connect a Qualified ATM to the Mastercard or Visa ATM Networks. Persons or entities that make space available to ISOs or affiliates of ISOs to operate a Qualified ATM on property they own or control, armored car firms that provide cash replenishment of Qualified ATMs, and Encryption and Support Organizations that manage encryption keys or service Qualified ATMs are not ATM Operators.

- **"Authorized Surcharged ATM Cash Disbursement"** means currency, including travelers cheques, obtained by accessing a cardholder's source of funds using an electronic connection to any Mastercard or Visa ATM Network at an ATM at which the cardholder's PIN was accepted, paid out to a cardholder using a payment card issued by a U.S.-based financial institution for which an access fee or surcharge was levied on the cardholder by the ATM Operator;

- **"Mastercard ATM Networks"** means the Maestro ATM network, the Cirrus ATM network, the Mastercard ATM network or any other ATM network owned or operated by the Mastercard Defendants.

- **"Mastercard Defendants"** means Mastercard Incorporated or Mastercard International Incorporated d/b/a Mastercard Worldwide.

- **"Mastercard Member"** means a financial institution that is a client of the Mastercard Defendants with membership rights in the Mastercard ATM Networks.

- **"Qualified ATM"** means an unattended payment card magnetic-stripe or payment card chip-reading terminal located in any of the 50 United States or the District of Columbia that has electronic and telecommunications capability, accepts PINs, and disburses currency;

- **"Visa ATM Networks"** means the Plus ATM network, Interlink ATM network, Visa Electron ATM network, or any other ATM network owned or operated by the Visa Defendants;

---

[9] ATM Operator Plaintiffs' Corrected Motion for Class Certification at 2-3, *Nat'l ATM Council, Inc. et al.*, No. 1:11-cv-01803-RJL (D.D.C. Sept. 23, 2019), Dkt. No. 154–1 [hereinafter "Plaintiffs' Corrected Motion"].

- **"Visa Defendants"** means Visa Inc., Visa U.S.A. Inc., Visa International Service Association, or Plus System, Inc.;

- **"Visa Member"** means a financial institution that is a client of the Visa Defendants with membership rights in the Visa ATM Networks.

18.     Cardtronics is a member of the certified class because it is an ATM Operator that originated Authorized Surcharged ATM Cash Disbursements at Qualified ATMs during the Class Period.

19.     Cardtronics was and is an ATM Operator within the meaning of the Amended Certification Order by virtue of the fact that, throughout the entire Relevant Period, Cardtronics was and continues to be (i) an "entity that owned, operated, or leased a Qualified ATM that was authorized by a Mastercard Member or Visa Member, or by the agent of such Member, to originate an ATM Cash Disbursement through the connection of the Qualifying ATM to the Visa or Mastercard ATM Networks," and (ii) an ISO "sponsored by a Mastercard Member or Visa Member and authorized to connect a Qualified ATM to the Mastercard or Visa ATM Networks."[10] ISOs are critical entities in foreign ATM transactions because any person or entity routing transactions through ATM networks must be a bank or a sponsored entity that is approved and monitored by a bank. Throughout the Relevant Period, and as to each of the affected Authorized Surcharged ATM Cash Disbursements for which Cardtronics seeks relief in this Complaint, Cardtronics (i) had the necessary sponsor arrangements by one or more sponsoring financial institutions, (ii) was registered with Visa and Mastercard as an ISO, and (iii) had the necessary processing arrangements and/or capabilities to route transactions over ATM networks.

---

[10] *See* Amended Certification Order, *supra* note 2, at 1 (incorporating by reference definitions set forth in Plaintiffs' Corrected Motion, Dkt. No. 154-1).

20.     Throughout the Relevant Period, Cardtronics provided access to ATM networks, connected Qualified ATMs to ATM networks, and otherwise "originated an Authorized Surcharged ATM Cash Disbursement at a Qualified ATM," *see* Amended Certification Order, *supra* note 2, through two different arrangements involving either ATM terminals owned by Cardtronics ("Company-Owned") or ATM terminals owned by third parties ("Affiliate/Merchant-Owned"). Under the Company-Owned arrangement, Cardtronics is the owner of the ATM terminal and itself provides all services required to operate the ATMs, which include, without limitation, monitoring, maintenance, cash management, customer service, and transaction processing. Company-Owned arrangements include, without limitation, ATMs that Cardtronics deployed under long-term contracts with major national and regional merchants, such as convenience stores, gas stations, grocery stores, drug stores, and other high-traffic locations. Under the "Affiliate/Merchant-Owned" arrangement, Cardtronics does not own the ATM. Rather, the ATM is owned by a third party that lacks the necessary bank sponsorship arrangements to obtain access to ATM networks and, as a contractual "affiliate" of Cardtronics, relies on Cardtronics for network access.

21.     In the United States, the number of Cardtronics' Company-Owned ATMs deployed during the Relevant Period peaked at more than 45,000, and Cardtronics deployed tens of thousands of additional ATMs under the Affiliate/Merchant-Owned arrangements. The table below lists approximate totals for each year of the Relevant Period:

| Year Ending | Company Owned | Affiliate/Merchant Owned |
|---|---|---|
| 2007 | 17,413 | 11,547 |
| 2008 | 16,630 | 11,711 |
| 2009 | 20,459 | 11,364 |
| 2010 | 24,594 | 11,329 |
| 2011 | 27,719 | 18,084 |
| 2012 | 31,573 | 26860 |
| 2013 | 34,064 | 30,489 |
| 2014 | 35,387 | 30,957 |
| 2015 | 44,049 | 46,166 |
| 2016 | 48,566 | 46,048 |
| 2017 | 44,070 | 45,766 |
| 2018 | 40,513 | 46,138 |
| 2019 | 40,792 | 47,854 |
| 2020 | 42,642 | 44,598 |
| 2021 | 42,719 | 47,866 |
| 2022 | 42,158 | 46,933 |
| 2023 | 42,123 | 46,802 |
| 2024 | 40,874 | 45,369 |

22.     On a continuous basis, and at all times during the Relevant Period, Cardtronics originated Authorized Surcharged ATM Cash Disbursements at Qualified ATMs and earned Net Interchange on those transactions at (i) all Company-Owned terminals, and (ii) some Affiliate/Merchant-Owned terminals (the "Included Affiliate/Merchant-Owned ATMs"). For clarity, Cardtronics does not base its opt-out claims on, and does not seek relief for, any Authorized Surcharged ATM Cash Disbursement involving any Company-Owned or Affiliate/Merchant-Owned ATMs where Cardtronics did not earn Net Interchange. Thus, as to each Authorized Surcharged ATM Cash Disbursement that is included in Cardtronics' opt-out claims herein, Cardtronics (i) was (prior to opt out) an injured class member within the meaning of *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), and its progeny; and (ii) was (and continues to be) a direct purchaser with antitrust standing within the meaning of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and its progeny.

23.     Additionally, from 2011 through 2017, Cardtronics, as purchaser, acquired the equity and/or assets of numerous independent ATM Operators (the "Acquired IAOs") that, prior to the acquisition, deployed both company-owned and third-party-owned ATMs in the United States, where they originated Authorized Surcharged ATM Cash Disbursements at Qualified ATMs. Without limitation, Cardtronics' major acquisitions included, in alphabetical order: Access To Money, Inc. ("Access"); Aptus Group, LLC and Aptus, Inc. (collectively, "Aptus"); ATM Network, Inc. ("ATM Network"); Automated Financial, L.L.C. ("Automated Financial"); C.G.I., Inc. ("CGI"); DR ATM II, Inc. ("DR ATM"); Efmark Deployment I, Inc., d/b/a Efmark Deployment Corporation, EDC ATM Subsidiary, LLC, and EDC Holding Company, LLC (collectively, "EDC"); Higher One, Inc. and Higher One Machines, Inc. (collectively, "Higher One"); Merrimak ATM Group, LLC ("Merrimak"); Travelex Currency Services Inc. ("Travelex"); and the "Welch" transaction, including C.O.D. LLC, RTW ATM LLC, WG ATM LLC, and WSILC L.L.C. These acquisitions are summarized in the table below, including (i) the closing date for each transaction, and (ii) the formation date if the Acquired IAO was formed after the start of the Relevant Period (October 1, 2007). Through the relevant acquisition date, each of the Acquired IAOs was sponsored by one or more financial institutions and was registered with Visa and Mastercard as an ISO or was an ISO's ATM-operating contractual affiliate.

| Acquired IAO | Currently Known Formation Date (if after 10/1/2007) | Acquisition Date |
| --- | --- | --- |
| Access To Money | 1/27/2009 | 8/15/2011 |
| Aptus | | 5/1/2013 |
| ATM Network | | 8/7/2012 |
| Automated Financial | | 2/6/2014 |
| CGI. | | 6/11/2015 |
| DR ATM | | 12/28/2017 |
| EDC | | 6/19/2011 |
| Higher One | | 4/15/2016 |
| Merrimak | | 6/3/2013 |
| Travelex | | 3/14/2017 |

| Acquired IAO | Currently Known Formation Date (if after 10/1/2007) | Acquisition Date |
|---|---|---|
| "Welch": | | 7/21/2014 |
|    C.O.D., LLC | .................................. | |
|    RTW ATM, LLC | .................................. | |
|    WG ATM, LLC | 5/21/2008 | |
|    WSILC, L.L.C. | 8/20/2010 | |

24.    The total number of company-owned ATMs acquired by Cardtronics from the Acquired IAOs was approximately 17,000. Cardtronics has not yet calculated the number of third-party-owned arrangements it acquired from the Acquired IAOs. Nor has Cardtronics determined the number of ATMs that were in deployment at any time prior to the date of Cardtronics' acquisition. Upon information and belief, the Defendants are in possession of sufficient records to identify the pre-acquisition Acquirer Fees that the Acquired IAOs paid to ATM networks between October 1, 2007 and the applicable acquisition date, and the Defendants and/or issuing banks are in possession of sufficient records to identify the pre-acquisition Interchange paid to Acquired IAOs during the same time period, in both company-owned and third-party-owned arrangements. As a result of these acquisitions, and under the express terms of the acquisition agreements, Cardtronics acquired and currently owns the Acquired IAOs' claims against the Defendants for pre-acquisition damages alleged in this Complaint, and Cardtronics asserts those claims herein. Cardtronics does not base its claims on, and does not seek relief for, pre-acquisition ATM transactions involving any third-party-owned ATMs where the Acquired IAO did not earn Net Interchange by receiving Interchange and paying an Acquirer Fee to ATM networks.

## II.    JURISDICTION AND VENUE

25.    This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for damages

under Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 and 1337.

26.     Venue in the United States District Court for the District of Columbia is proper under 28 U.S.C. § 1391 because each Defendant transacts business and/or is found within this District. A substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws alleged herein was and is carried out within this District. The acts complained of have had, and will have, substantial anticompetitive effects in this District.

27.     Jurisdiction over the Defendants comports with the United States Constitution and with 15 U.S.C. §§ 15, 22, and 26.

## III.   THE PARTIES AND NONPARTY CO-CONSPIRATORS

### A.     Plaintiff

28.     Plaintiff Cardtronics USA, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia. Cardtronics is the largest independent non-bank deployer of ATMs in the United States. Since at least 2007, and on a continuous basis to the present date, Cardtronics has been an ATM Independent Sales Organization and an ATM Operator, as defined *supra* ¶ 17.

29.     In July 2015, Cardtronics acquired Columbus Data Services, L.L.C. ("CDS L.L.C."), a leading independent ATM processor. Since the 2015 acquisition, Cardtronics has operated as an ATM processor through its d/b/a designation, "Columbus Data Services" (referred to as "CDS"), a division of Cardtronics. Since the 2015 acquisition and continuing to the present, CDS has provided a range of ATM processing services, including terminal driving, connectivity to ATM and major PIN debit networks, control over cryptographic functions, settlement and accounting, reporting, and tech support. From the start of the Relevant Period and continuing through the 2015 acquisition, CDS L.L.C. provided a similar range of services.

**B.    Defendants**

30.    Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Visa Inc. became a publicly held corporation after an initial public offering of its stock began trading on the New York Stock Exchange on March 18, 2008. Visa Inc. is a global organization with a presence in more than 200 countries and territories and nearly 21,500 employees around the world. Visa Inc. offers credit card and debit card network services to issuing financial institutions, acquiring financial institutions, and merchants. Visa Inc. has offices, transacts business, or is found in the District of Columbia.

31.    Defendant Visa U.S.A. Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Visa U.S.A. Inc. is owned and controlled by Visa Inc. Prior to Visa Inc.'s IPO in March 2008, Visa U.S.A. Inc. operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California. Its owner/members included approximately 14,000 banks.

32.    Defendant Visa International Service Association is a Delaware corporation with its principal place of business in San Francisco, California. Visa International Service Association is owned and controlled by Visa Inc. Prior to Visa Inc.'s IPO in March 2008, Visa International Service Association operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California. Its owner/members included approximately 21,000 banks.

33.    Defendant Plus System, Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Plus System, Inc. is owned and controlled by Visa Inc.

34.    Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc. are collectively referred to herein as "Visa."

35.     Defendant Mastercard Incorporated is a Delaware corporation with its principal place of business in Purchase, New York. Mastercard Incorporated has offices, transacts business or is found in the District of Columbia. Mastercard Incorporated became a publicly held corporation after an IPO of its stock began trading on the New York Stock Exchange on May 25, 2006. Prior to its IPO, Mastercard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York.

36.     Defendant Mastercard International Incorporated is a Delaware non-stock membership corporation with its principal place of business in Purchase, New York. It is owned and controlled by Mastercard Incorporated. Prior to Mastercard Incorporated's IPO in March 2006, Mastercard International Incorporated was a Delaware membership corporation that consisted of more than 23,000 owner/member banks worldwide and was the principal operating subsidiary of Mastercard Incorporated.

37.     Defendants Mastercard Incorporated and Mastercard International Incorporated are collectively referred to herein as "Mastercard."

38.     The acts charged in this Complaint as having been done by Defendants and their co-conspirators were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' business or affairs, and the acts charged in this Complaint continue to the present day.

### C.     Non-Party Co-Conspirators

39.     Unnamed co-conspirators in Defendants' anticompetitive schemes include all bank issuers of debit/ATM cards with Visa and/or Mastercard ATM network functionality, and all bank acquirers of ATM transactions processed on Visa's and Mastercard's ATM networks. The acts charged in this Complaint as having been done by these non-party co-conspirators and the Defendants were authorized, ordered, or done by their officers, agents, employees, or

representatives while actively engaged in the management of the non-party co-conspirators' business or affairs, and the acts charged in this Complaint continue to the present day.

## IV.    FACTUAL BACKGROUND

### A.    Brief History and Overview of "Independent" ATMs

40.    Prior to 1996, all ATMs were operated by banks, and banks were prohibited by law from imposing a per-transaction fee directly on ATM cardholders. Beginning in about 1996, state laws and network rules prohibiting such charges were abolished, creating an opportunity for nonbanks to enter the market and provide similar services to consumers.

41.    Nonbank entities that provide ATM services to consumers include ATM ISOs and their contractual affiliates. Throughout the Relevant Period, Cardtronics has been, and continues to be, a large ISO with numerous and large contractual affiliates. Cardtronics and its affiliates help fill consumer demand for conveniently located ATMs. Cardtronics-owned ATMs typically have been located in prominent retail stores, such as Kroger, Target and Walgreens, in addition to airports and other locations where consumers may need access to their money and bank-deployed ATMs are not traditionally found. In doing so, Cardtronics has materially increased the availability of ATM cash access services to consumers and retailers, particularly in less affluent areas that are underserved in terms of cash access by bank-deployed ATMs.

42.    ATM transactions are not possible and cannot originate without access to an ATM network. During the Relevant Period, an overwhelming majority of cards used for ATM transactions have been Visa- or Mastercard-branded debit cards linked to consumers' bank accounts. To accept a Visa- or Mastercard-branded PIN debit card, the ATM Operator must have access to the Visa or Mastercard PIN-based networks. To route ATM transactions over the Visa or Mastercard networks, an ATM Operator must either be a "member" of Visa and Mastercard or be "sponsored" by a member. Under Visa's and Mastercard's Rules, only banks may be members

of Visa or Mastercard. An ATM ISO must be sponsored by a member bank acting as a "sponsoring financial institution" or must affiliate itself with such a sponsored ISO. Cardtronics is, and throughout the Relevant Period has been, an ISO sponsored by member banks.

43. From a technological standpoint, Visa- and Mastercard-branded PIN debit cards may be configured to effect cash withdrawals over non-Visa and non-Mastercard EFT networks, including Star (owned by First Data), Pulse (Discover Card), NYCE Payments Network, LLC, ACCEL/Exchange Network, Credit Union 24, Co-op Financial Services, Shazam, Inc., Jeanie Network, and TransFund. The alternative networks (sometimes referred to as "regional networks"), are identified by service marks impressed on the reverse side of the card, referred to as "bugs."

### B. The Mechanics of an ATM Transaction

44. ATMs allow holders of certain payment cards—typically debit cards with PIN-authentication functionality—to withdraw cash instantly from the account(s), typically a demand deposit account, which has been linked to the debit card.

45. There are several parties involved in an ATM transaction:

- The *cardholder* is the end-user who uses a debit/ATM card to access linked accounts from which he or she can withdraw cash.

- The *issuing bank*, or *issuer*, is the bank at which the cardholder maintains an account(s) and from which the cardholder receives the debit/ATM card.

- At bank-owned ATMs, the *acquiring bank*, or *acquirer*, is the bank that operates the ATM. Bank-owned ATMs are typically found at the acquirer's own branch locations and, in some instances, at off-site locations.

- At non-bank ATMs, *independent ATM operators* work with a sponsoring bank (that also acts as an acquirer to the ATM Operators), and often a *third-party processor* (such as CDS), to provide ATM services to consumers. As defined in the ATM Operator Class Action, which definition is incorporated herein, the term "ATM Operator" includes ISOs. ATM Operators generally deploy ATMs at merchant locations and certain locations with high foot traffic, such as airports, major train stations, arenas, and stadiums. Independent ATM operators materially increase the availability of ATM cash access services to cardholders and retailers, particularly in less affluent areas that are underserved in terms of cash access. Cardtronics is the largest independent ATM operator in the United States.

- Debit cards are linked to at least one, and in many cases, more than one ATM *network*. In an ATM transaction, the *network* provides the infrastructure that connects the ATM to the issuing bank (or the processor that supports the issuing bank) to enable access to the cardholder's funds held at the bank. *Networks* also establish the rules that all parties in an ATM transaction (including ATM Operators) must follow, and they set the acquirer fees and interchange fees associated with accepting and processing ATM transactions. Visa's Plus network and Mastercard's Cirrus network are currently the two largest ATM *networks* in the United States. Other ATM *networks* include PULSE, NYCE, STAR and other "regional networks" referenced above.

46.    To initiate a transaction at an ATM, a cardholder inserts his or her card at the ATM terminal and enters a PIN. If, for example, the cardholder requests a cash withdrawal, the acquirer

(or processor) sends an authorization request to the card issuer, which is routed over one of the networks enabled by the card. If the issuer approves the request, the approval is transmitted through the network to the acquirer, and the ATM dispenses cash to the cardholder.

47.     Most debit/ATM cards have multiple ATM networks enabled—virtually always Visa's Plus and/or Mastercard's Cirrus ATM networks. Likewise, virtually all ATMs accept—as a matter of business necessity—Defendants' ATM networks. ATM transactions using non-Visa or non-Mastercard ATM networks, such as the "regional networks" named above, can be conducted with Visa- or Mastercard-branded cards that bear the bug of an unaffiliated network. Thus, from a technological standpoint, ATM Operators could (and, but for the Defendants' anticompetitive restraints, Cardtronics *would*) configure their ATMs to prompt cardholders to the lowest-cost network (*i.e.*, the network that deducts lower fees and remits the greatest Net Interchange) through price signals or other means that express a preference for cheaper or more cost-effective and efficient ATM networks. But, as explained below, such a prompt violates Visa's and Mastercard's anti-competitive rules.

**C.     The Fee Structure of a Foreign ATM Transaction**

48.     Foreign ATM transactions generate several types of fees:

- *Access Fees*. A consumer that consummates a surcharged withdrawal transaction at an ATM not owned by a bank may be charged an *access fee* ("Access Fee") that is paid to an ATM operator. The cardholder is notified of the Access Fee, including the amount, immediately after the cardholder enters a PIN. The cardholder must affirmatively agree to the Access Fee for the process to continue. The amount of the Access Fee is set by the ATM operator. As to Cardtronics' claims herein, Cardtronics set and/or retained ultimate

control over (or, but for the Access Fee Rules, never would have yielded such control over) the amount of the Access Fee.

- *Foreign ATM Fees*. In addition to the Access Fee paid to the ATM operator, cardholders may be charged *foreign ATM fees* ("Foreign Fees") by their issuer for using an ATM outside the issuer's fleet. Cardholders are not notified of these fees during the ATM transaction; they are applied on the cardholder's monthly bank statement.

- *Interchange Fee*. The issuer pays an *interchange fee* ("Interchange") to the ATM operator as compensation for the costs associated with ownership and/or operation of the ATM. (As to Cardtronics' claims herein, Cardtronics was paid Interchange for transactions on both Company-Owned ATMs and the Included Affiliate/Merchant-Owned ATMs.) The amount of the Interchange is set by the network, and the amount of the Interchange that flows from the issuer to the ATM operator is also set by the network, after the network's deduction of the Acquirer Fee (described below).

- *Acquirer Fee*. An *acquirer fee* ("Acquirer Fee") is paid to the ATM network on which the transaction is authorized and routed. The Acquirer Fee is deducted by the ATM network from the Interchange the issuer pays to the ATM operator, and the ATM operator receives a payment that is referred to as "Net Interchange." (As to Cardtronics' claims herein, Cardtronics paid Acquirer Fees and received Net Interchange for transactions on both Company-Owned ATMs and the Included Affiliate/Merchant-Owned ATMs, *see supra* ¶ 22.) The amount of the Acquirer Fee is set by the ATM network.

- *Switch Fee*. An issuer pays a *switch fee* ("Switch Fee") to the ATM network that is determined by the issuer's contract with the network.

49.     From the ATM Operator's standpoint, the ATM transaction fees generate two sources of revenue: (a) Access Fees (surcharges) paid by consumers; and (b) the Net Interchange (*i.e.*, the net of the Interchange less the Acquirer Fee). If Acquirer Fees increase and/or Interchange decreases, Net Interchange decreases, and the ATM Operator loses revenue.

50.     Although these categories of fees have been in place throughout the Relevant Period, beginning in or around 2007 and intensifying in 2010, Visa and Mastercard dramatically reduced Net Interchange for transactions routed over their networks. Mastercard raised its Acquirer Fees from $0.05 to $0.18 in 2010. Visa followed by raising its Acquirer Fees from $0.06 to $0.16 in 2012. Concurrent with these changes, Visa and Mastercard introduced tiered Interchange for large bank issuers, which materially reduced the Interchange from which Acquirer Fees are deducted to determine Net Interchange. The combined impact of these fee changes and degraded economics substantially affected the ATM industry and rendered the Defendants' ATM networks the most expensive and least profitable networks for Cardtronics to accept.

51.     In December 2023, Mastercard issued a bulletin announcing an additional "ATM fee on surcharged transactions in the United States region" in the amount of $0.10. This additional $0.10 is over and above the $0.18 Acquirer Fee implemented in 2010 and became effective in April 2024. Since then, Cardtronics has paid this additional $0.10 Acquirer Fee—a total of $0.28— for all surcharged transactions on both Company-Owned ATMs and the Included Affiliate/Merchant-Owned ATMs.

52.     In this action, Cardtronics seeks injunctive relief and damages to redress the anticompetitive restraints imposed by Visa and Mastercard that have precluded Cardtronics from

exercising the competitive tools it could otherwise deploy to negotiate competitive Acquirer Fees with Visa and Mastercard and receive competitive Net Interchange.

### D.    The ATM Restraints: Visa's and Mastercard's "Non-Discrimination Rules"

53.    During the Relevant Period, Defendants maintained and enforced (and continue to maintain and enforce) Access Fee Rules—so-called "non-discrimination rules"—stipulating that, to the extent ATM Operators charged consumers Access Fees for the use of ATM terminals, they could not charge higher Access Fees for Visa's or Mastercard's ATM networks. Put another way, the Access Fee Rules preclude Cardtronics and other ATM Operators from charging cardholders *lower* Access Fees for transactions processed on a competitor's network, even if that competing network offers network service at a lower cost to the ATM Operator. Cardtronics and other ATM Operators were forced to abide by the Access Fee Rules or lose access to the Defendants' networks.

54.    Access Fees have existed in the ATM industry since the mid-1990s. In the absence of the Access Fee Rules, a sophisticated ATM Operator such as Cardtronics could easily communicate differential Access Fees to consumers to stimulate price competition among ATM networks by making the cost differences of such networks transparent to cardholders. Such differential pricing would have provided immediate benefit to consumers in the form of reduced Access Fees, thereby stimulating consumer demand for ATM cards that offered lower-cost ATM transactions. Since these lower-cost ATM transactions would be available only for transactions routed over networks that did not charge ATM Operators supracompetitive prices, differential pricing would have prevented supracompetitive Acquirer Fees (paid to the networks), and maintained Interchange (set by the networks) at competitive levels. In short, by stimulating competition among networks, differential surcharging would have resulted in lower prices for both ATM Operators and cardholders, thereby increasing the deployment of ATMs. Such a competitive outcome was barred by Visa's and Mastercard's ATM Restraints and Access Fee Rules.

55.     Throughout the Relevant Period, Visa's and Mastercard's Rules have been binding on acquirers and sponsoring banks. In addition, Visa and Mastercard require acquirers and sponsoring banks to bind affiliated ISOs (such as Cardtronics) to these Rules through contract. In turn, if the ISO also provides network access to other independent ATM owners or operators as affiliates, the ISO has a responsibility to ensure that these affiliates comply with the network's rules and requirements. As a result, Cardtronics and other ATM Operators cannot route transactions on Visa's and Mastercard's ATM networks if they do not agree to abide by the networks' respective rules. Visa and Mastercard monitor and enforce these rules to ensure uniform and consistent compliance with them.

56.     The current Mastercard Rules dated June 3, 2025, set forth the "Rules for Activities and Digital Activity." Rule 3.6 provides in pertinent part:

**3.6 Non-discrimination—ATM and Bank Branch Terminal Transactions**

**Pursuant to the Standards, each Customer must:**

1. **Honor all valid Cards at each ATM Terminal and Bank Branch Terminal for which it is responsible, in a manner that is no less favorable than the manner in which it honors the cards of any other ATM network in which the Customer participates; and**

2. **Acquire and process all valid Transactions in a manner that is no less favorable than the manner in which it acquires and processes transactions of any other ATM network in which the Customer takes part.**

**Except as the Standards permit, a Customer must not discriminate against other Customers of the Corporation as to any of the terms or conditions upon which it honors Cards, or acquires or processes Transactions.**

As relevant to the claims asserted in this Complaint, this restriction is the substantive equivalent of earlier rules in force throughout the Relevant Period. *See, e.g.*, Rule 7.14.1.2 of Mastercard's Cirrus Worldwide Operating Rules (Dec. 21, 2012), restated as Rule 4.17.3, Mastercard Rules (Dec. 18, 2018) (providing that "Acquirers"—and thus independent ATM Operators—"must not

charge an ATM Access Fee in connection with a Transaction that is greater than the amount of any ATM Access Fee charged by that Acquirer in connection with the transactions of any other network accepted at that terminal.").

57.    Rule 6.4.1.4 and Table 6-1 of the "Visa Core Rules and Visa Product Service Rules," dated April 12, 2025, provide that an "Acquirer" (and thus an ATM Operator) "that chooses to impose an ATM Access Fee must comply with all of the following":

> **Ensure that the Access Fee is not greater than the Access Fee amount on all other similar Transactions through any other network at the same ATM….**

As relevant to the claims asserted in this Complaint, this restriction is the substantive equivalent of earlier rules in force throughout the Relevant Period. *See, e.g.*, Regulation 4.10A of Visa Plus System, Inc. Operating Regulations ("An ATM Acquirer may impose an Access Fee if: It imposes an Access Fee on all other Financial Transactions through other shared networks at the same ATM; The Access Fee is not greater than the Access Fee amount on all other Interchange Transactions through other shared networks at the same ATM ...."); *see also* Visa Int'l Operating Regulations (Oct. 15, 2012) ("An ATM Acquirer may impose an Access Fee on an international ATM Cash Disbursement if: It imposes an Access Fee on all other international ATM Cash Disbursements through any other networks at the same ATM; The Access Fee is not greater than the Access Fee amount on all other international transactions; and The Access Fee is a fixed and flat fee."); *id.* (making international rule applicable to domestic transactions) ("An ATM Acquirer in a country where an Access Fee for domestic ATM Cash Disbursements is permitted by Visa must comply with the requirements specified for International ATM Cash Disbursement surcharge fees.").

58.    The Access Fee Rules preclude ATM Operators from using differentiated Access Fees to steer cardholders to the lowest-cost ATM network. When Visa and Mastercard increased their pricing dramatically to Cardtronics, Cardtronics could have—and, in the absence of the

Access Fee Rules, would have—used differential surcharging to encourage cardholders to demand access to, and select, cheaper networks. Specifically, Cardtronics could and would have implemented a prompt that displays the available ATM networks for each transaction, along with differential Access Fees applicable to each ATM network, and thereby prompt the cardholder to pick the most cost-effective option or to demand from issuers a card that offers the most cost-effective option. Because cardholders likely would have selected the network with the lowest Access Fee (and/or would have demanded cards linked or otherwise providing access to the lowest fee), Visa and Mastercard would have been forced to compete for ATM transactions by lowering their network fees to ensure that their transactions were not differentially priced by Cardtronics. The ensuing competition would have benefited Cardtronics, other ATM Operators, and consumers alike. But such competition was barred by Visa's and Mastercard's Access Fee Rules.

59.    Protected from competition by their anti-competitive rules, Visa and Mastercard have been able to dramatically raise Acquirer Fees and reduce Interchange (either of which reduces Net Interchange), without the threat that the increased cost to ATM Operators will result in consumer demand for ATM cards that route ATM transactions to competing lower-cost networks.

60.    As alleged more fully below, Cardtronics examined whether it could charge higher Access Fees for transactions routed over Defendants' ATM networks and lower Access Fees for more efficient networks and thereby steer cardholders to ATM networks that paid Cardtronics higher Net Interchange. But both Visa and Mastercard confirmed that such differential surcharging and transparent pricing would violate their rules. Because of Visa's and Mastercard's substantial market power, Cardtronics had no choice but to abide by (and did in fact abide by) these rules notwithstanding its vigorous objection to them and strong desire to reduce its per-transaction costs through differential pricing strategies.

E.    **The Horizontal Nature of the Separate but Related Visa and Mastercard Cartels**

61.    The Visa and Mastercard networks came into existence as associations jointly owned and controlled by their member banks that competed against each other, including ATM/debit issuing banks that issued ATM/debit cards to cardholders. At all times prior to the Mastercard IPO in 2006 and the Visa IPO in 2008, the banks—as association "members"—elected a board of directors composed exclusively, or almost exclusively, of competing member banks. That board, with the cooperation and assent of the member banks, in turn established, approved and agreed to adhere to rules and operating regulations, including the Access Fee Rules that eliminated horizontal, interbrand competition between the member banks as described above.

62.    In a pre-IPO antitrust case against Visa and Mastercard, the U.S. Department of Justice successfully challenged "exclusionary rules" that restricted member banks' issuance of cards on the Discover and American Express networks. The U.S. Court of Appeals for the Second Circuit held in 2003 that Visa and Mastercard:

> are not single entities; they are consortiums of competitors. They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions. These 20,000 banks set the policies of Visa U.S.A. and MasterCard. These competitors have agreed to abide by a restrictive exclusivity provision.... The restrictive provision is a horizontal restraint adopted by 20,000 competitors.

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003).

63.    Like the "exclusionary rules" in *United States v. Visa U.S.A.*, Visa's and Mastercard's rules regarding ATM transactions, including the Access Fee Rules at issue in this case, are the product of agreements among horizontal competitors that restrict competition. The Access Fee Rules promulgated and implemented before the Visa and Mastercard IPOs have been maintained without material (if any) alteration until this day.

64.    The Visa and Mastercard IPOs were structured in a way that cosmetically changed the networks' corporate forms while leaving their anti-competitive rules intact. Pre-IPO, Visa's and Mastercard's member banks conspired through the associations' governing boards and/or through the banks' ownership of Visa and Mastercard, to control every aspect of Visa's and Mastercard's business, including by agreeing to the rules regarding ATM transactions. Post-IPO, Visa and Mastercard act as the pricing- and rules-enforcement agencies for their member banks. In fact, as part of the reorganizations leading up to the IPOs, Visa's and Mastercard's member banks reaffirmed and effectively readopted each network's rules, including those regarding ATM transactions. Each member bank knew and understood that Visa's and Mastercard's ATM rules, including the Access Fee Rules, would continue after the IPOs. Those rules have persisted to this day.

65.    Visa and Mastercard exist—and have always existed—to further the interests of their member banks. The member banks did not "withdraw" from the alleged conspiracy by virtue of the IPOs, and the IPOs did not terminate or negate any unlawful agreement or concerted action between the Defendants and the member banks as non-party co-conspirators. The member banks developed and adopted the Access Fee Rules when the banks controlled Visa and Mastercard, and in addition to benefiting Visa and Mastercard, the Rules also benefited the banks, who were equity shareholders of the associations (and therefore financial beneficiaries of the deal). And, the Rules protected banks from competition with each other over the types of bugs offered on bank cards. The Rules remained intact after the IPOs by the continued agreement of the banks, not by the unilateral impositions by the bankcard associations themselves. Member banks continued to derive the same benefits after the IPOs, and those unlawful benefits continue to the present day. *Osborne*, 797 F.3d at 1068 ("We therefore reject the Defendants' assertion that the public offerings dispelled

any hint of conspiracy. The Plaintiffs have adequately alleged an agreement that originated when the member banks owned and operated Visa and MasterCard and which continued even after the public offerings of those associations.").

66.     Moreover, each member bank knew, understood and agreed that its competitors would agree or continue to agree to be bound by the Access Fee Rules both before and after the IPOs. Indeed, the banks have continued to issue Visa- and Mastercard-branded cards and to comply with the Access Fee Rules at their own ATMs. Furthermore, even though the banks no longer directly control Visa and Mastercard, the banks coordinate with the Defendants to route more transactions over their networks in various ways, such as the Mastercard priority rule, which, as alleged *infra* ¶¶ 80-82, maintains and expands market power and continues to suppress price competition.

67.     Several member banks continue to benefit indirectly from the Access Fee Rules. Because the major banks still own shares in Visa and Mastercard, the banks reap some ongoing financial benefit from increased profits at Visa and Mastercard. And by removing any incentive for customers to demand multi-bugged debit cards, the banks are able to avoid competition with each other on network offerings attached to their cards.

68.     Each Defendant's Access Fee Rules independently restrain competition among banks apart from the existence of the other Defendant's Rules, thus giving rise to two interrelated but separately identifiable arrangements: the "Visa Cartel" and the "Mastercard Cartel."

## V.    TRADE AND INTERSTATE COMMERCE

69.     The Defendants' PIN debit payment cards, issued by the nation's banks and other depository institutions, are utilized in an enormous volume of ATM transactions involving a substantial dollar amount of commerce and are marketed, sold and used in the flow of interstate

commerce. A "PIN debit" payment card is any card that requires entry of a "personal identification number"—a cardholder's unique 4-digit code—to authenticate a debit transaction at the point of the transaction. Visa provides ATM services for cards branded with the Visa, Visa Electron, Interlink, and Plus service marks at ATMs and terminals connected to the Visa, Plus, and Interlink networks. During the Relevant Period, cardholders used Visa-branded cards to access billions of dollars in cash in the United States. Mastercard provides ATM services for cards branded with the Mastercard, Maestro, or Cirrus service marks at ATMs and terminals participating in the Mastercard network. During the Relevant Period, cardholders used Mastercard-branded cards to access billions of dollars in cash in the United States.

## VI.    <u>RELEVANT MARKET</u>

70.    Cardtronics alleges a per se violation of the antitrust laws. For this reason, there is no need to plead a relevant product or geographic market. To the extent market definition is required, Cardtronics alleges as follows:

71.    The relevant product market affected by the ATM Restraints is the market for ATM network services, in which the above-described ATM networks sell network services to bank and nonbank operators of ATMs. No cost-effective alternative to ATM network services exists for operators of ATMs, and there are no substitutes. Accordingly, a sufficient number of ATM operators would not switch away from the ATM network services offered by these networks to make a small but significant price increase in those services unprofitable.

72.    In the alternative—and only to the extent that a "two-sided market" with multiple participants, *Ohio v. American Express Co.*, 585 U.S. 529 (2018), may be relevant to Cardtronics' claims under a "rule of reason" analysis—the relevant product market affected by the ATM Restraints is the "platform on which foreign ATM transactions occur." From the cardholder's

perspective, there are no cost-effective products that are reasonably interchangeable to a foreign ATM transaction that constrain the ability of Defendants to exercise market power through the ATM Restraints, as evidenced by the continued existence of Access Fees greater than zero. If a hypothetical monopolist imposed a significant non-transitory increase to the fees associated with ATM network services to ATM Operators, there would be no available substitutes for ATM Operators or (to the extent ATM Operators pass along the increase) for cardholders to switch to in response. In addition, if an ATM network imposes constraints that increase the total price the cardholder pays for a foreign ATM transaction on the platform above competitive levels for a significant non-transitory period of time, there would be no reasonably interchangeable substitutes to switch to in response.

73.    More specifically, and only to the extent relevant to the alternatively alleged two-sided-market with multiple participants, the platform on which foreign ATM transactions occur:

    a.    offers different products or services to different groups of participants in that it (i) offers ATM network services to ATM Operators, thus enabling ATM Operators to acquire foreign ATM transactions and provide ATM services to consumers, subject to the terms of the network; (ii) enables issuers to communicate with ATM Operators and thus offer cardholders foreign ATM transaction capabilities, subject to the terms of the network; and (iii) offers to consumers/cardholders—subject to the terms imposed by the network—the ability to withdraw cash and perform other banking functions at ATMs that are neither owned nor operated by the bank that issued the consumer's ATM card;

    b.    connects different groups of participants—consumers, issuers and ATM Operators—in simultaneous transactions; and

c. exhibits indirect "network effects," as defined by *American Express* and its progeny. "Indirect network effects exist where the value of the two-sided platform to one group of participants depends on how many members of a different group participate." *American Express*, 585 U.S. at 535. Issuers benefit from the increased deployment of ATMs. ATM Operators benefit from more cards being issued. Both of those effects increase the use of ATM cards in foreign ATM transactions, which is to the benefit of cardholders. But for the ATM Restraints, such increased participation would stimulate competitive Access Fees.

74.     ATM Operators, like Cardtronics, that pay Acquirer Fees to ATM networks are direct purchasers in the alleged relevant product markets.

75.     The relevant geographic market is comprised of the United States and its territories and possessions.

## VII.    <u>MARKET POWER</u>

76.     Throughout the Relevant Period, Visa and Mastercard have possessed and exercised substantial market power in the relevant markets. ATM Operators, including Cardtronics, must accept Visa- and Mastercard-branded ATM cards as a matter of business necessity. The vast majority of debit cards issued in the United States are Visa- or Mastercard-branded cards, with Plus or Cirrus functionality. To accept a Visa- or Mastercard-branded PIN debit card, the ATM Operator must have access to the Visa or Mastercard PIN-based networks. To attract cardholders to nonbank ATMs, only ATM ISOs that are registered with Visa may display a Visa logo on ATM terminals, and only an ATM ISO registered with Mastercard may display a Mastercard logo. As a result of the coercive effect of their "must have" status, Visa and

Mastercard have possessed and exercised market power throughout the Relevant Period, irrespective of their actual or apparent market share.

77.     While market-share analysis is not determinative of the market power alleged herein, Defendants' growing market share is significant. Since 2007, more than 70% of all withdrawals at Cardtronics ATMs in the United States have been routed over the Mastercard and Visa networks. On an industry-wide basis, more than half of all ATM transactions are now routed over Defendants' networks.

78.     In addition, Visa's and Mastercard's substantial market power is supported by direct evidence of their ability to substantially raise prices on ATM Operators without losing acceptance. Specifically, in 2010, Visa and Mastercard began raising network fee rates, ultimately increasing the rates by over 300%. Despite this substantial price increase, Visa and Mastercard lost no meaningful ATM Operator acceptance.

79.     Throughout the Relevant Period, Visa and Mastercard have possessed and exercised substantial market power even if the relevant market is two-sided with multiple participants and defined as the platform on which foreign ATM transactions occur. In the context of a two-sided market with multiple participants, the price faced by a consumer for a foreign ATM transaction equals the Access Fee (*i.e.*, surcharge) plus a Foreign Fee assessed by the card's issuing bank when the card is used to make a foreign transaction. As alleged more fully below, *see infra* Section VIII, the supracompetitive network service fees paid by Cardtronics and other ATM Operators correlate positively to increased Access Fees paid by consumers with no offsetting decline in Foreign Fees (or other offsetting benefits to consumers). Foreign Fees paid by consumers to issuers on the platform on which foreign ATM transactions occur have remained elevated. Thus, Visa and Mastercard have exercised substantial market power in the alternatively

alleged two-sided market with multiple participants by reducing Net Interchange, resulting in supracompetitive prices to consumers on the platform on which foreign ATM transactions occur.

80.     Further, Mastercard adopted strategies and entered into agreements to protect and expand market power. For example, Mastercard's market-power strategy included the Mastercard Priority Rule, which provides as follows:

> "Authorization Routing: … An Acquirer of … ATM Transactions … may default route to the Interchange System any such Transaction not belonging to its proprietary network. The Interchange System determines whether or not the Transaction is being performed by a Cardholder. An Acquirer that does not default route such Transactions to the Interchange System must recognize all active Account ranges that are included in the Corporation's Financial Institution Table (FIT) or Member Parameter Extract (MPE) files **and must follow the Issuer's routing instructions, if any, set forth in those files.**"

Thus, under the priority rule, where an issuer has set Mastercard's network as the "priority" network, the transaction must be so routed. The enforcement mechanism for this rule included fines against the ATM Operator. With respect to Cardtronics, Mastercard imposed or threatened to impose an assessment of $20,000 for each infraction.

81.     In the absence of the ATM Restraints, issuers would not have designated Mastercard a "priority" network (ever or as often), given that the existence of differential surcharging by Cardtronics and others would have increased consumer demand for cards with lower surcharges (*i.e.*, cards under which Mastercard was not the designated "priority" network).

82.     At bottom, the priority rule and associated fine structure is yet another hammer in Mastercard's anticompetitive toolbox in furtherance of the anticompetitive restraints. The priority rule provides pretext for Mastercard to impose or threaten to impose hefty fines on any ATM Operators that dare to route a transaction over a less costly and more efficient network. This routing flexibility is the bedrock of (and step one toward) differential surcharging, which is prohibited by the Access Fee Rules. As such, the priority rule was intended to be, and in fact operated as, a

deterrent to the development of differential surcharging technology and other innovations. In other words, if an ATM Operator even took "step one" in the direction of differential surcharging by routing transactions over less costly networks, that ATM Operator would suffer "death by a thousand cuts" in the form of fines under the priority rule. In that way, Mastercard reduced the likelihood that it would ever need to exercise the "nuclear" (and more obviously illegal) enforcement option—denial of access to the Mastercard network—for an ATM Operator's violation of the Access Fee Rules through differential surcharging. As such, the priority rule provides one more level of protection for the ATM Restraints, which reward inefficiency to the benefit of Defendants and at the expense of ATM Operators and consumers.

83.     Defendants also established, maintained and expanded their market power in light of significant barriers to entry faced by potential competitors.

## VIII.   ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY

84.     Visa's and Mastercard's ATM Restraints harmed (and continue to harm) competition in the relevant market(s) by eliminating ATM Operators' ability to make the different costs of ATM networks transparent to ATM cardholders. In doing so, the ATM Restraints eliminate ATM network competition on price at the ATM Operator level. As a result, ATM networks that compete with Cirrus and Plus have no ability or incentive to reduce their ATM network fees to Cardtronics to get additional volume from Cardtronics and other ATM Operators. In fact, the Access Fee Rules create the opposite incentive: competing networks responded to Plus's and Cirrus's network fee increases by raising their network fees as well. For Cardtronics, these increases followed both the Mastercard increase to $0.18 in April 2010, and Visa's increase from $0.05 to $0.15 in April 2012. While the actual price-point of the Acquirer Fees charged by

rival networks was a small fraction of the supracompetitive Visa and Mastercard Acquirer Fees, the percentage increases were significant. Without limitation:

- <u>Exchange</u>. After the Mastercard increase and before the Visa increase, Exchange for the first time started to charge Cardtronics an Acquirer Fee. After the Visa increase, Exchange increased its Acquirer Fees by 300%.

- <u>NYCE</u>. In August 2011 (after the Mastercard increase and before the Visa increase), NYCE increased Acquirer Fees to Cardtronics by 40%. In April 2012 (just days after the Visa increase), NYCE Acquirer Fees increased another 43%.

- <u>PULSE</u>. In May 2010 (one month after the Mastercard 300% increase), PULSE increased Acquirer Fees to Cardtronics by 200%. In October 2011, PULSE increased Acquirer Fees by another 33%, and in May 2012 (one month after the Visa increase), PULSE increased Acquirer Fees by another 150%.

- <u>STAR</u>. In April 2011 (after the Mastercard increase and before the Visa increase), STAR Acquirer Fees to Cardtronics on surcharged transactions increased by 43% and, for the first time, STAR imposed Acquirer Fees on non-surcharged withdrawals.

85.    The Access Fee Rules caused Cardtronics and other ATM Operators to respond to Defendants' price increases by raising Access Fees on transactions routed over all networks, thereby externalizing the impact of the price increase across the ATM networks that compete with Plus and Cirrus.

86.    In a competitive market in the absence of the Access Fee Rules, ATM networks would compete on price to gain volume and share, and that competition would have kept ATM network fees to ATM Operators at competitive levels.

87.     Because of the lack of price competition in the ATM network market, Cardtronics and other ATM Operators paid supracompetitive ATM network fees, and they continue to do so to this day. In addition, these higher fees harmed cardholders that use independent ATMs to access their cash. It did so by forcing them to pay higher Access Fees and by restricting the number of terminals deployed by Cardtronics and other ATM Operators. In the absence of the anti-competitive rules and harm they inflicted, Cardtronics and other ATM Operators would have deployed more ATMs, all else being equal. This reduction in output, along with supracompetitive Access Fees to cardholders, harmed consumer welfare.

88.     Even if the alternatively alleged two-sided market with multiple participants is the relevant area of competition, harm to competition is demonstrated through elevated, and supracompetitive, total prices for ATM network access on the platform on which foreign ATM transactions occur ("total price" being equal to the Access Fee—*i.e.*, surcharge—plus a Foreign Fee assessed by the card's issuing bank when the card is used to make a foreign transaction). While diminished Net Interchange is not the only factor affecting Access Fees charged by ATM Operators, an increase in Acquirer Fees correlates positively to an increase in Access Fees. Defendants' own statements corroborate that relationship, such as Mastercard's statement in a 2017 presentation that "[a]s interchange decreases ATM operators increase their [access] fees." *See Nat'l ATM Council*, 2023 WL 4743013 at *8 (citing J.A. 3105 (Carlton Expert Report) (quoting J.A. 1930 (Berman Decl., Ex. 1, Mastercard Presentation 6)). Further, throughout the Relevant Period, issuers have maintained or increased Foreign Fees during the Relevant Period, thereby maintaining the total price for ATM network access on the platform on which foreign ATM transactions occur at supracompetitive levels, or pushing the total price to even higher supracompetitive levels.

89.     Defining the relevant product market as a two-sided platform with multiple participants does not change, and cannot negate, the economic impact and anticompetitive effect of the Access Fee Rules on a consumer's total price for a cash withdrawal, which includes Access Fees (paid to acquirers) and Foreign Fees (paid to issuers). Changes in Acquirer Fees do not affect the marginal costs of issuing banks with respect to an ATM transaction, all else equal, and so there is no reason to expect Foreign Fees to fall as Acquirer Fees increase. Unlike the positive relationship between Acquirer Fees and Access Fees that industry participants recognize and that Defendants' own data will show, Foreign Fees of Bank of America, Chase, Wells Fargo, Citibank, U.S. Bank, PNC, TD Bank, and BB&T did not fall during the period from 2004 to 2016, despite the general decline in Interchange levels. Instead, they increased for each bank during this period. This evidence, and more, indicates that even if charging ATM Operators higher Acquirer Fees created a theoretical possibility that ATM networks could charge issuers lower Switch Fees or lower Interchange or provide any other "incentive," issuers did not in fact pass along those benefits to cardholders in the form of reduced Foreign Fees. Moreover, the notion that cost savings to issuers (in the form of reduced Switch Fees or Interchange charged by Defendants) *would* result in a reduction of Foreign Fees paid by cardholders on the issuer side of the two-sided market exposes the flaw in Defendants' contradictory (and counterfactual) contention that, on the acquirer side of the two-sided market with multiple participants, there is no positive relationship between an increase in the ATM Operator's costs (in the form of inflated Acquirer Fees) and an increase in Access Fees paid by cardholders.[11] Thus, reduced Net Interchange resulted in higher Access Fees

---

[11] *See* Defendants' Motion to Compel ATM Operators to Produce Updated Transactional Data Comparable to Their Original Data Reports, *Nat'l ATM Council, Inc. et al.*, No. 1:11-CV-01803-RJL, at 3-4 (D.D.C. April 12, 2024), Dkt. No. 224 (citing Expert Report of Glenn Hubbard, Feb. 18, 2020) ("ATM Operators' data reports have already proved valuable in assessing surcharging practices, and their relationship with net interchange, which are at the heart of this

and (at best) no decline or (worse) an actual increase in Foreign Fees during the Relevant Period, meaning that the cardholder's two-sided price increased as a result of the Access Fee Rules.

90.    To the extent that Defendants may have taken a portion of the overcharges unlawfully extracted from Cardtronics and other ATM Operators and shared them with issuers, that transfer does not negate the existence of an anticompetitive effect in the alternatively alleged two-sided market with multiple participants. For example, Mastercard has claimed that it shared a portion of the inflated Acquirer Fees with nonparty issuers and labeled that distribution as "incentive payments" or "a lower fee per transaction (interchange and switch fees)."[12] Even if such payments existed, the Defendants' reallocation of revenue from ATM Operators to certain issuers has resulted in no reduction of foreign fees that issuers/banks charge consumers in a foreign transaction. Moreover, given that Foreign Fees have not decreased during the Relevant Period, Mastercard's distribution of a "cut" of the ill-gotten gains to issuers/banks (*i.e.*, nonparty co-conspirators) by disguising them as "incentive payments" would only confirm the existence of a per se unlawful horizontal arrangement between Defendants and nonparty co-conspirator issuers/banks. The two-sided market analysis under *American Express* has no application to per se unlawful arrangements.

91.    In summary, anticompetitive effects caused by the Access Fee Rules in a two-sided market with multiple participants defined as the platform on which foreign ATM transactions occur include, without limitation:

---

case. … Defendants' expert [Glenn Hubbard] found … that [surcharges] did not respond to changes in net interchange in the way [plaintiffs] have claimed they would: their surcharge increases were not related to prior decreases in net interchange even over a five-year time span.").

[12] *See* Defendants' Class Certification Opp., *supra* note 1.

a.   increased cost of foreign ATM transactions on the platform on which foreign ATM transactions occur that are above a competitive level, in that the Access Fee Rules result in supracompetitive Acquirer Fees paid by ATM Operators and higher Access Fees paid by consumers, that are not fully offset by benefits, if any, to consumers.

b.   reduced output and fewer ATM transactions as alleged above, which are equally relevant to the two-sided market with multiple participants.

## IX.    INJURY IN FACT TO CARDTRONICS

92.    As a proximate result of the anticompetitive conduct alleged herein, Cardtronics (i) has "suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant[s], and (iii) is capable of resolution and likely to be redressed by judicial decision." *See Osborn*, 797 F.3d at 1063 (internal quotation omitted). In the absence of the Access Fee Rules, ATM Operators would offer consumers differentiated Access Fees at the point of transaction, consumers would then demand multi-bug PIN cards from their banks, their banks would provide these cards, and the market for network services would become more competitive—all resulting in more choice of networks and lower Access Fees for consumers.

93.    Cardtronics has the incentive, desire and technical capacity to offer discounts on cards linked to low-cost networks, and it possessed this capability throughout the entire Relevant Period. As stated in Cardtronics' annual report filed with the SEC, "[s]ince 2006, we have operated our own EFT transaction processing platforms, which were further expanded with our acquisition of Columbus Data Services, L.L.C. ('CDS') in 2015. EFT transaction processing enables us to process and monitor transactions on our ATMs and to control the flow and content of information

appearing on the screens of such ATMs." 2017 Cardtronics plc, Annual Report (Form 10-K) at 10 (Mar. 1, 2018).

94.     Contemporaneously with the Defendants' dramatic increases in Acquirer Fees in 2010 and 2012, Cardtronics specifically examined whether it could charge higher Access Fees for Cirrus and Plus transactions to steer cardholders to cheaper networks. Evidence includes, but is not limited to:

      a.  2011 & 2012 internal Cardtronics slide decks that note "Possible Economic Mitigation Strategies" to MC's & Visa's increase in fees/reduction in interchange include ***'Differential surcharging'*** (for MC & Visa, prepaid cards, credit cards, rebating institutions, int'l transactions, etc.)"

      b.  A 2013 internal Cardtronics email chain showing Cardtronics performing ***successful tests on terminals*** regarding differential surcharging.

      c.  In response to the question whether Cardtronics can differentially surcharge from a technological viewpoint, a 2015 internal email from Jerry Garcia states succinctly, "We are doing it." This latter point (c) refers to the enhanced technological capabilities of Cardtronics as the owner of Allpoint, the world's largest retail-based, surcharge-free ATM network, which Cardtronics has owned since 2006.

95.     In response to Cardtronics' expressed desire and obvious technological ability to implement differential surcharging, both Visa and Mastercard confirmed that differential surcharging would violate their rules. In a 2015 internal Cardtronics email, Executive Vice President David McCrary explained the Defendants' explicit position that Cardtronics' ability to

"segment surcharge" (*i.e.*, differential surcharge) was limited by network rules (*i.e.*, the Access Fee Rules).

96.     Other ATM Operators had the same incentive and desire to offer discounts on cards linked to low-cost networks. Upon information and belief, they also had the requisite technical capacity; but even if they lacked technical capacity, even the threat of differential pricing from Cardtronics and/or other ATM Operators would drive competition among networks to charge lower and more competitive network fees. In turn, this would increase the Net Interchange flowing to Cardtronics and other ATM Operators and allow them to offer lower Access Fees to consumers and deploy additional ATM terminals.

97.     Consumers are sensitive to differences in Access Fees and, where possible, will seek out ATMs with the lowest Access Fees. Indeed, consumer sensitivity to surcharging is the fundamental premise underlying the popularity and success of Cardtronics' surcharge-free network, Allpoint. Cardtronics markets the Allpoint network as one that (i) benefits consumers by offering surcharge-free ATM transactions, and (ii) benefits merchants by increasing foot traffic in their stores, as consumers are drawn to the store by the surcharge-free ATM.

98.     Independent research supports the Allpoint business premise and confirms consumer sensitivity to variations in Access Fees. A recent intercept survey by the public opinion company, Creative Consumer Research, asked retail customers in Houston, Illinois, Georgia and New Jersey about their use of ATMs in U.S. retail stores (the "Allpoint Survey"). The objective was to ascertain the impact of in-store ATMs on consumer traffic and purchase behaviors. All respondents were surveyed on store premises at locations where ATMs were available when the store was open. A combined total of 53% of respondents said they chose it because they weren't charged a fee for using it (40% referencing a surcharge-free nonbank ATM and 13% a surcharge-

free bank ATM). Further questioning about "the attributes respondents valued most in an ATM" confirmed that 65% of respondents list "[f]ree to use" as an important attribute, surpassing all other attributes tested in the survey (62% for "Secure, safe to use"; 27% for "Convenient location of store"; 9% for "Easy to find in the store"; 11% for "ATM owned by my bank/has my bank's brand"; and 27% for "Reliable.") The results of this study are publicly available.[13]

99.     The Allpoint Survey is consistent with earlier independent studies, which have confirmed robust consumer price sensitivity throughout the Relevant Period. For example, a 2012 J.D. Power and Associates report found that fees were the number one reason customers shopped for a new primary bank, and one-third of customers of big and large regional banks cited fees as the main reason. "It is apparent that new or increased fees are the proverbial straws that break the camel's back," stated Michael Beird, director of the banking services practice at J.D. Power and Associates.[14]

100.     The plausibility of the economic assumptions underlying differential pricing has been recognized by the court. In the Class Actions, the U.S. Court of Appeals for the D.C. Circuit identified and recognized as "plausible" three "economic assumptions" embedded in the theory of economic harm (*i.e.*, injury in fact): "that other consumers besides the [ATM Operators] are price conscious"; "that [issuers] will respond to consumer demand for cards tied to low-cost networks"; and  "that in the face of competitive pressure, ATM networks will reduce their network fees." *Osborn*, 797 F.3d at 1065. Cardtronics adopts and alleges each of those three economic underpinnings herein.

---

[13] *Why consumers go out of their way to use in-store ATMs*, NCR Atleos (Sept. 13, 2024), https://www.ncratleos.com/insights/atm-survey-results.

[14] *See* E. Scott Reckard, *J.D. Power*, L.A. Times (Feb. 27, 2012), https://www.latimes.com/business/la-xpm-2012-feb-27-fi-mo-switching-banks-20120227-story.html (discussing results of the J.D. Power and Associates report).

101.    Throughout the Relevant Period, Cardtronics also possessed the requisite control over Access Fees to implement differential surcharging. With respect to all Company-Owned ATMs, Cardtronics set and controlled the Access Fee. As to the Included Affiliate/Merchant-Owned ATMs, (i) the relevant agreement expressly gave Cardtronics ultimate control over surcharging or, alternatively, (ii) but for the ATM Restraints and the prohibition of differential surcharging, Cardtronics never would have ceded ultimate control over surcharging for transactions on any of the Included Affiliate/Merchant-Owned ATMs.

102.    In short, Cardtronics has been injured by, *inter alia*, increased Acquirer Fees, decreased Interchange paid by issuers/banks (tiered Interchange), and Defendants' imposition of other supracompetitive charges and fees for ATM network services that exceed what those fees would be in a reasonably competitive market without the ATM Restraints.

103.    Cardtronics has suffered antitrust injury because the injury caused by the ATM Restraints is the type of injury that flows directly from the anticompetitive effects of the violation, and is the type of injury the antitrust laws were intended to prevent.

## X.    NO COUNTERVAILING FACTORS

104.    There are no valid, procompetitive benefits to ATM Restraints that outweigh the anticompetitive effects or that cannot be obtained through less restrictive means. The Access Fee Rules and related conduct are not reasonably necessary to protect Defendants' technology, incentivize customer growth, prevent free riding, or achieve any other claimed benefit. Defendants can achieve any legitimate, procompetitive objectives without imposing the ATM Restraints challenged in this case, or those benefits could be achieved through less restrictive means. Moreover, the ATM Restraints are horizontal, not vertical, in nature, and as such no justification can be articulated.

105.    To the extent that Defendants now claim that the Access Fee Rules are pro-consumer because they prevent "price gouging" by ATM Operators in the form of inflated Access Fees, Defendants ignore the effect of competition at the ATM Operator level. The Access Fee Rules do not set a cap on Access Fees. Surcharge increases are currently constrained by competition, and removal of the Access Fees would not alleviate that competitive downward pressure. Further, the alternatively alleged two-sided market with multiple participants clearly exposes Defendants' "pro-consumer" claim as disingenuous. The total price to the consumer under the alternatively alleged platform on which foreign ATM transactions occur includes *both* the Access Fees charged by ATM Operators and the Foreign Fees charged by issuers. Defendants have no rule regarding Foreign Fees that is comparable to the Access Fee Rules.

## XI.    **TOLLING OF STATUTE OF LIMITATIONS**

106.    The running of the four-year statute of limitations under 15 U.S.C. § 15b that might otherwise apply to the private antitrust claims asserted herein has been, and continues to be, tolled by the filing of the Class Actions in October 2011. Tolling applies under *American Pipe* because:

    a.  Cardtronics, as an opt-out plaintiff, is a member of the certified class in the ATM Operator Class Action;

    b.  Cardtronics' opt-out claims were brought in the ATM Operator Class Action complaint and turn on the same evidence, memories, and witnesses as those asserted in the class action; and

    c.  The Defendants named in Cardtronics' opt-out Complaint were also named in the ATM Operator Class Action complaint.

107.    Cardtronics is also entitled to the tolling of the statute of limitations as to its allegations of a two-sided market with multiple participants. The second amended complaint (the

operative complaint) in the ATM Operator Class Action was filed before the Supreme Court decided *American Express*, in which the Court recognized the two-sided market with multiple participants for financial platforms. Nonetheless, the plaintiffs in the related *Mackmin* Class Action timely presented a two-sided market analysis through their expert, Dennis Carlton, and the issue was part of the extensive class certification briefing in 2021. Thus, Defendants were clearly on notice of the two-sided market theory in the Class Actions, and they had more than a full opportunity to litigate the issue; indeed, they *actually* litigated it,[15] and the district court rejected the Defendants' arguments at the class certification stage. *Nat'l ATM Council, Inc.*, 2021 WL 4099451 at *7 ("[P]laintiffs are correct that defendants' specific arguments should not be dispositive at the class certification stage. *Amex* applies in 'rule of reason' cases, while plaintiffs here contend that the Access Fee Rules are subject to *per se* treatment. Additionally, the market here is not a mirror image to the three-participant market in *Amex*."), *aff'd*, 2023 WL 4743013. Moreover, Cardtronics' two-sided market allegations do not challenge any *new* conduct by the Defendants; rather, Cardtronics' theory is presented within the existing framework of the Defendants' *same* anticompetitive rules and conduct that resulted in the supra-competitive network fees.[16]

108.    Defendants will not be unduly prejudiced by Cardtronics' assertion of these opt-out claims. The defendants have received fair notice through the class action "of the number and generic identity of the potential [opt-out plaintiffs] and their substantive claims," *McCarthy v.*

---

[15] *See, e.g.*, Defendants' Class Certification Opp., *supra* note 1, at 57-65.

[16] *See In Re Payment Card Interchange Fee & Merchant Discount Litig.*, 2018 WL 4158290, at *14 (E.D.N.Y. Aug. 30, 2018) (holding that *American Pipe* tolling applied to opt-out plaintiffs' two-sided market allegations where *American Express* was decided after filing of the original complaint alleging only single-side market "because Defendant had the requisite notice of the alleged anticompetitive conduct resulting in supracompetitive interchange fees").

*Kleindienst*, 562 F.2d 1269, 1274 (D.C. Cir. 1977), including the claims of Cardtronics asserted herein. Accordingly, tolling applies to the full range of claims and for the full duration of the court-approved Class Period commencing on October 1, 2007.

## XII.   VIOLATIONS ALLEGED AND CLAIMS FOR RELIEF

### Claim 1: Sherman Act, Section 1, 15 U.S.C. § 1
### (Against Visa and Mastercard for Unlawful
### Agreement Among and Between Competing Banks)

109.    The ATM Restraints constitute an agreement between horizontally competing banks unreasonably to restrain trade to fix prices for ATM services, to avoid competition between issued cards at the ATM terminal, and to protect and shield Defendants from competition from competing ATM networks. Each Defendant's ATM Restraints independently restrain interbrand competition among banks and violate Section 1 of the Sherman Act, apart from the existence of the other Defendant's ATM Restraints. The ATM Restraints were collectively and directly agreed to by the competing member banks prior to the Defendants' IPOs, and after the IPOs, the Defendants have continued to implement, manage and enforce the collusive arrangement for the illicit benefit of their member banks and to shield themselves from competition on the basis of the costs and efficiencies of the ATM networks that they operate.

110.    The inter-bank agreements embodied in Defendants' rules have, and will continue to, restrain trade in interstate commerce by fixing the price of Access Fees in a manner that prevents ATM customers from choosing to use lower-cost ATM network services, protecting rival banks from competition on the basis of the kind of ATM cards issued by each bank, and protecting Defendants' ATM networks from competition from one another and from rivals. By unlawfully insulating Defendants' bank members and ATM networks from competition, the agreements increase the costs of card acceptance to Cardtronics and other ATM Operators, increase consumer Access Fees and Foreign Fees above reasonably competitive levels, reduce output and the number

of ATM terminals deployed, harm the competitive process, raise barriers to entry and expansion, and hinder innovation and investment in the ATM industry.

111.    The ATM Restraints are not reasonably necessary to accomplish any pro-competitive goal, and no procompetitive benefits result from them. Any efficiency benefit is outweighed by anticompetitive harm, and less restrictive alternatives exist by which Defendants could reasonably achieve the same or greater efficiency.

112.    By also shielding the networks from competition against one another and from unaffiliated networks, these collusive agreements have enabled Defendants to maintain and impose supracompetitive overcharges on ATM Operators for ATM network services and to impose other fees and costs injuring Cardtronics.

113.    As a result of these anticompetitive effects of the ATM Restraints, Cardtronics has been injured in its business and property in an amount not presently known. Cardtronics has been injured by supracompetitive fees that greatly exceed the fees that would be paid by ATM Operators for network services in a competitive market not governed by the ATM Restraints. Cardtronics seeks to recover for overcharge damages that have been directly imposed upon it by the Defendants.

114.    As a further result of the ATM Restraints, which are continuing in nature, Cardtronics faces irreparable injury. The violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Cardtronics has no adequate remedy at law.

<u>**Claim 2: Sherman Act, Section 1, 15 U.S.C. § 1**</u>
<u>**(Against Visa for Unreasonable Vertical Agreements**</u>
<u>**Between Visa and Its Member Banks)**</u>

115.    After Visa's IPO, the ATM Restraints, formerly agreed by and among the banks, took on the form of a series of agreements between Visa and its member banks that bind the latter to observe the ATM Restraints. These agreements unreasonably restrain trade by prohibiting and

preventing price competition between banks in Access Fees for ATM services and inhibiting competition between Visa, Mastercard and other providers of ATM network services in violation of Section 1 of the Sherman Act.

116.    Visa has market power in the market for ATM network services. Alternatively, Visa has market power in the two-sided market with multiple participants defined as the platform on which foreign ATM transactions occur. Visa uses its market power to force ATM Operators, including Cardtronics, to accept its operating rules, including the ATM Restraints, which enables Visa to overcharge Cardtronics supracompetitive network fees.

117.    There is no procompetitive justification for requiring the member banks to abide by the ATM Restraints or for the member banks to agree to them.

118.    As a direct and proximate result of the unreasonable agreements between Visa and its member banks, Cardtronics has been injured as herein alleged.

119.    As a further result of the ATM Restraints, Cardtronics faces irreparable injury. The violations and the effects thereof are continuing, and will continue, unless the injunctive relief requested herein is granted. Cardtronics has no adequate remedy at law.

### Claim 3: Sherman Act, Section 1, 15 U.S.C. § 1
### (Against Mastercard for Unreasonable Vertical Agreements
### Between Mastercard and Its Member Banks)

120.    After Mastercard's IPO, the ATM Restraints, formerly agreed by and among the banks, took on the form of a series of agreements between Mastercard and its member banks that bind the latter to observe the ATM Restraints. These agreements unreasonably restrain trade by prohibiting and preventing price competition between banks in Access Fees for ATM services and inhibiting competition between Visa, Mastercard and other providers of ATM network services in violation of Section 1 of the Sherman Act.

121.    Mastercard has market power in the market for ATM network services. Alternatively, Mastercard has market power in the two-sided market with multiple participants defined as the platform on which foreign ATM transactions occur. Mastercard uses its market power to force ATM Operators, including Cardtronics, to accept its operating rules, including the ATM Restraints, which enables Mastercard to overcharge Cardtronics supracompetitive network fees.

122.    There is no procompetitive justification for requiring the member banks to abide by the ATM Restraints or for the member banks to agree to them.

123.    As a direct and proximate result of the unreasonable agreements between Mastercard and its member banks with regard to the ATM Restraints, Cardtronics has been injured as herein alleged.

124.    As a further result, Cardtronics faces irreparable injury. The violations and the effects thereof are continuing, and will continue, unless the injunctive relief requested herein is granted. Cardtronics has no adequate remedy at law.

## <u>REQUEST FOR RELIEF</u>

Wherefore, Cardtronics respectfully demands:

(i)      that the Court declare, adjudge and decree that Defendants have committed the violations of law alleged herein;

(ii)     that the Court enjoin Defendants' enforcement of the anti-steering rules;

(iii)    that the Court award damages sustained by Cardtronics due to Defendants' violations of law, in an amount to be proved at trial and to be trebled in accordance with the antitrust laws, plus interest (including prejudgment interest), attorneys' fees, and costs of suit;

(iv)    that the Court grant such other and further relief as it may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues triable as of right by a jury.

Dated: August 20, 2025                    Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By:  /s/ Richard Feinstein
         Richard Feinstein
         (DC Bar Number 324848)
         1401 New York Ave, NW
         Washington, DC 20005
         Phone: (202) 237-2727
         Fax: (202) 237-6131
         rfeinstein@bsfllp.com

         Stuart H. Singer
         (Fla. Bar No. 377325)
         James Grippando
         (Fla. Bar No. 383015)
         Carlos M. Sires
         (Fla. Bar No. 319333)
         401 East Las Olas Blvd., Suite 1200
         Fort Lauderdale, Florida  33301
         Telephone:  (954) 356-0011
         Facsimile:   (954) 356-0022
         ssinger@bsfllp.com
         jgrippando@bsfllp.com
         csires@bsfllp.com